

FILED

09/14/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0547

DA 20-0547

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 234N

JANET L. HAFFNER-LYNN,

Plaintiff and Appellant,

v.

MISTY L. ANNALA,

Defendant and Appellee.

FILED

SEP 14 2021

Bowen Greenwood
Clerk of Supreme Court
State of Montana

APPEAL FROM:   District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADV-18-0373
Honorable Jon A. Oldenburg, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Randy L. Tarum, Tarum Law Office P.C., Great Falls, Montana

For Appellee:

Steven T. Potts, Steven T. Potts, PLLC, Great Falls, Montana

Submitted on Briefs:  August 4, 2021

Decided:  September 14, 2021

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Janet L. Haffner-Lynn appeals from an Eighth Judicial District Court order denying her motion for summary judgment and subsequent judgment and order following a bench trial regarding money that was transferred out of her joint account with her husband shortly before his death. We affirm.

¶3 Janet L. Haffner-Lynn (Janet) and James W. Lynn (James) were married in 1996. Before their marriage, Janet and James executed a premarital agreement to protect Janet's substantial assets, which included a successful bar, in the event the marriage did not work out. In addition to maintaining their own individual bank accounts, Janet and James had several shared accounts: a checking account ending in 6114; a market interest savings account ending in 4313 (4313 Account); and a certificate of deposit ending in 2719 (CD Account). The 4313 Account was initially funded by a $50,000 deposit from Janet. However, aside from an isolated $2,111.25 deposit in 2015, all money entering the 4313 Account following the initial deposit came from James's civil service pension.

¶4 In 2016, Janet was forced to move into a senior living facility due to poor health. James continued to reside in the couple's home.

¶5 On July 6, 2017, James signed a power of attorney (POA) appointing Misty Annala (Misty), his daughter from his first marriage, as his agent.

¶6 On October 19, 2017, Misty accompanied James to his bank to meet with personal banker Sarah Fleming (Fleming). According to Fleming, James had recently "spooked himself" by putting checks in incorrect envelopes as he paid his bills, motivating him to ensure that Misty would be able to help him with paying bills and managing financial affairs in the future. Fleming described several potential options. Fleming testified that Misty did almost nothing at the meeting except take notes and that James, after discussing the matter with Fleming, established a plan to open a new account co-owned by himself and Misty. James explained to Fleming that he intended to fund the new account with money from the 4313 Account and the CD Account. Fleming testified that James and Misty were running late for another meeting and left before opening or funding a new account.

¶7 On October 28, 2017, James was found collapsed in his home and transported to the hospital. On October 30, 2017, Misty returned to the bank to open an account co-owned by James and her. Misty took signature cards for the new account and authorization to close the CD to the hospital, where James signed them, and returned to the bank. Upon Misty's return with these documents, Fleming opened a joint account held by James and Misty and transferred money into this account. Fleming testified that she agreed to do so because Misty was James's POA and Misty wanted Fleming to do exactly what James had independently described as his own plan approximately a week prior. After the transfers, the CD jointly owned by Janet and James was closed, $50,000 remained in the 4313

3

Account jointly owned by James and Janet, and $122,331.53 had been moved into the new account owned jointly by James and Misty.

¶8 Upon completion of these transfers, Misty began using the shared account with James to pay various expenses, particularly bills incurred by James. Misty used a $25,000 check, signed by James, to purchase a vehicle. Misty also withdrew an additional $20,000, allegedly at James's direction to be split among the grandchildren, from James's shared account with Janet and transferred it into James's shared account with Misty. However, Misty reversed that transaction after Janet complained about it. On November 23, 2017, James died.

¶9 Janet brought suit against Misty, seeking the return, plus interest, of the money taken from the Janet-James joint accounts. Janet's subsequent motion for summary judgment was denied in an October 29, 2019 District Court Order, which found that the undisputed facts did not demonstrate that James was subject to undue influence or had not directed or benefitted from the financial transfers. On December 18, 2019, the District Court signed a Pre-Trial Order governing the trial of the case. After a bench trial, the District Court issued a Judgment and Order finding in favor of Misty. Janet appeals from both the Order on Motion for Summary Judgment and the subsequent Judgment and Order following trial.

¶10 A district court's findings of fact are reviewed for clear error, which exists when the findings are not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if a review of the record leaves this Court with a definite and firm conviction that a mistake has been made. *AAA Constr. of Missoula, LLC v. Choice Land Corp.*, 2011 MT 262, ¶ 17, 362 Mont. 264, 264 P.3d 709. Conclusions of law are reviewed

4

for correctness. *Slauson v. Bertelsen Family Trust*, 2006 MT 314, ¶ 10, 335 Mont. 43, 151 P.3d 866.

¶11 We first address Janet's argument that the District Court improperly limited the scope of its analysis to the claims set forth in her original complaint. She contends that the District Court should have relied instead on the contentions set forth in the Pre-Trial Order. *See Faulconbridge v. State*, 2006 MT 198, ¶ 69, 333 Mont. 186, 142 P.3d 777 ("[A] pretrial order supersedes the pleadings.").

¶12 In particular, Janet points to the District Court's prefacing of its analysis of the case:

> **B. The minimal focus given to Plaintiff's original causes of action, which should form the foundation of this entire matter, make it challenging to focus on what is truly at issue here.**
>
> This case has been pending for more than a year and a half. Despite the dense record it has accrued in that time, including docket submissions, trial exhibits, a partial trial transcript, and other related evidence, *Plaintiff's original complaint is the <u>sole</u> document that even mentions the claims upon which Janet now seeks relief,* much less describes them in detail or applies facts to them. Although both parties raised some law relevant to those claims while crafting their arguments and rebutting those from the other side, they ultimately drifted from such advocacy, particularly as filings stretched ever further from the complaint.
>
> Considering the size and complexity of the record, plus both parties' failure to consistently limit their arguments and evidence to the counts at issue, the Court required substantial time and effort to craft an accurate and appropriately focused holding. Ultimately, the Court determined that large swaths of the record in this case, which may seem relevant at first glance, instead relate to matters beyond the scope of Plaintiff's legal claims. Because Plaintiff never supplemented or amended her complaint, however, the Court cannot stray similarly far afield to indulge those tangential points without exceeding its proper jurisdiction over this matter. *This holding is thus confined to the four (4) counts raised within the four (4) corners of the filing from which the matter originated.* The Court hopes this explanation minimizes confusion and makes the holding easier to take in and comprehend in aggregate.

(Citations and footnote omitted, italic emphasis added.)

5

¶13    The four counts set forth in the original complaint and addressed by the District Court were: Conversion/Embezzlement; Unjust Enrichment/Restitution; Breach of Fiduciary Duty; and Elder Financial Abuse/Financial Exploitation. Janet contends that the Pre-Trial Order put forth claims of "breach of fiduciary duty, undue influence and unjust enrichment."[1] Notably, two of these—breach of fiduciary duty and unjust enrichment— were expressly among the four counts set forth in the original complaint that the District Court did address at length in its decision. Though the remaining claim for "undue influence" was not a named section of the District Court's decision, the court considered at length Janet's allegation that Misty had "nefariously manipulated James." The court also addressed Janet's assertion that Misty improperly converted money through "undue influence" in a section addressing Janet's claims of elder abuse and financial exploitation. Even if the vague assertions put forth in the Pre-Trial Order could constitute claims capable of superseding those found in the original complaint, Janet points to none that were not addressed in substance by the District Court. Especially given the voluminous record and unfocused legal arguments presented, the District Court did not err in its chosen method of framing and responding to the parties' contentions.

¶14    Next, Janet argues that the District Court erred when it dismissed Janet's claim for breach of fiduciary duty because Misty did not owe a fiduciary duty to Janet. Janet asserts that statute grants her, as James's wife, standing to bring a claim of breach of fiduciary

---

[1] The "Issues of Law" section of the Pre-Trial Order states: "This case involves general issues of law concerning breach of fiduciary duty, undue influence, financial exploitation and theft."

duty against Misty. *See* § 72-31-321(1)(d), MCA (providing that the principal's spouse may petition for judicial review of an agent's conduct and seek appropriate relief).

¶15 Regardless, Janet cannot prevail on the merits of her fiduciary duty claim. Section 72-31-319(1)(a), MCA, provides that an agent acting pursuant to a power of attorney shall "act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest." Janet contends that, because Misty benefitted personally as a result of the agency relationship with James, the burden shifts to Misty to show that she acted reasonably. Misty contests this argument. However, we need not decide this issue because the District Court's factual findings here are sufficient for Misty to demonstrate that she acted appropriately, regardless of where the burden is placed. The District Court found:

> While [Janet] alleges [Misty] nefariously manipulated James into opening a joint account with her and transferring funds into it, she offers no proof for that claim. [Misty], on the other hand, offers both her own testimony and that of [bank] employee Sarah Fleming to support her contention that James—not [Misty]—independently decided to open a joint account with Misty after conferring with Ms. Fleming about avoiding further problems paying bills. [Misty] and Ms. Fleming also both testified that James independently told Ms. Fleming he intended to fund that new joint account using assets from the [4313] account and [CD Account]. [Janet] does not assert that Ms. Fleming acted improperly when her advice led James to open a joint account with [Misty], nor does she discount Ms. Fleming's testimony as inaccurate or biased. Given the evidence presented by both sides, the Court finds [Misty's] explanation of how and why the joint Misty-James account was opened more persuasive than [Janet's].

¶16 These factual findings are based on substantial evidence and demonstrate that Misty acted "in accordance with [James's] reasonable expectations to the extent actually known by [Misty] and, otherwise, in [James's] best interest."

7

¶17 Janet also argues on appeal that Misty exceeded her authority under her POA. Misty's POA authorized her to make transfers for the "benefit of myself[, James,] as client." After consulting with personal banker Fleming, James sought to have his funds transferred from his joint accounts with Janet into a joint account with Misty and for her to help him pay his bills. Misty did so, thereby benefitting James. Misty did not exceed her authority under the POA.

¶18 Janet contends that the District Court failed to apply the proper legal standard to her argument that Misty exerted undue influence over James.[2] More specifically, Janet argues the District Court erred in failing to consider the five factors laid out in *Monroe v. Marsden*, 2009 MT 137, ¶ 21, 350 Mont. 327, 207 P.3d 320, for analyzing issues of undue influence. However, Janet concedes that the *Marsden* factors "are not exclusive or mandatory." *Marsden*, ¶ 21.

¶19 Janet next argues that the District Court failed to adequately address the testimony of James's nurse practitioner, who indicated that James could have been more susceptible to undue influence than others. However, the District Court did examine James's medical records and concluded that, while the progress notes did evidence "declining cognitive abilities" after James was hospitalized, they "consistently portray James as generally

_____

[2] As noted above, while the District Court framed its analysis in accordance with the four claims in Janet's complaint, it also addressed Janet's allegation of undue influence as part of its analysis of Janet's Elder Financial Abuse/Financial Exploitation claim and responded to what it deemed to be exaggerated and unsubstantiated allegations that Misty had "nefariously manipulated" James.

cooperative, responsive, pleasant, and able to follow commands and answer questions" rather than as "incompetent, delusional, or uncomprehending."

¶20 More to the point, mere susceptibility to influence does not establish its actuality. *In re Estate of Mead*, 2014 MT 264, ¶¶ 27, 29, 376 Mont. 386, 336 P.3d 362 (emphasizing that "mere suspicion that undue influence may have or could have been brought to bear is not sufficient" and that "general allegations of poor health are not sufficient to show undue influence" (internal quotations and alterations omitted)). Janet failed to offer any direct evidence that Misty had actually exerted undue influence over James. Rather, Janet's argument is premised on ascribing nefarious intent to Misty in light of her apparent incentive to disinherit Janet through the transfer of James's money from the James-Janet accounts to the new James-Misty account shortly before his death.

¶21 However, as the District Court noted, evidence of these alleged incentives is not as strong as Janet would have us believe. It is not clear from this record that the consequences that the transfers would have upon the disposition of any funds remaining at the time of James's death were unknown to James, but known to Misty, at the time of the transactions. Rather, Fleming testified that James had made clear while at the bank that he wanted "Janet to have the $50,000.00 that she had put towards the CD when they had opened it up and that he would take the rest,"[3] suggesting that it was not his intention that the money he had

---

[3] Notably, Fleming testified that Misty had reminded James that $50,000.00 of this joint account had been provided by Janet, further undermining the allegation that Misty was working in secret to harm Janet's financial interest.

contributed to the account go to Janet, should he predecease her.[4]  Similarly, the District Court found that it was not at all apparent at the time of the transfers that James's death was imminent, as his treatment team had been preparing him for discharge at least until November 12, 2017.  This undercuts the assumption that James was expected to predecease Janet and leave a substantial amount of unspent money, allegedly incentivizing Misty to disinherit Janet by displacing Janet as the joint account holder with James.

¶22    In sum, there is no direct evidence in the record supporting a finding of undue influence exerted by Misty and any circumstantial evidence suggesting as much is based upon imagined incentives that Janet has not shown to exist at the time of the contested acts. The District Court wrote at length rejecting the "speculation or exaggeration" used in filings to make "unflattering and unfounded assertions regarding the intentions and behavior" of Misty.  The record supports the District Court's conclusion that Misty was acting upon the clear wishes of her father, who wanted Misty's help in managing his finances.

¶23    Janet's next contention is that the District Court should have awarded her a constructive trust as a remedy for unjust enrichment.  She did not request a constructive trust remedy in either her complaint or the Pre-Trial Order.  Moreover, though Janet claims that the District Court "failed to consider that Misty was unjustly enriched in the amount of $144,407.20 and a new car," the District Court clearly considered, and rejected, Janet's unjust enrichment claim in Part III of its Judgment and Order, entitled "E. Defendant is not

---

    [4] This is not inconsistent with the spirit of the couple's premarital agreement through which they strove to maintain a degree of separation between their finances.

10

liable for unjust enrichment . . . ." The District Court found that the complained of transactions were authorized by James and that the evidence did not show that Misty acted without authority or by way of "trick or pressure" in using a check signed by James to buy herself a car. Janet does not contest the District Court's analysis on her unjust enrichment claim. As she does not show that the District Court erred in dismissing her unjust enrichment claim, she cannot show that the court erred in failing to provide her with a constructive trust as a remedy for that claim.

¶24 Finally, Janet argues that a number of the District Court's factual findings constituted clear error, leading to defective legal conclusions. For one, Janet argues that the District Court erred in finding Misty credible. However, credibility determinations are for the trier of fact, not this Court on appeal, to make. *See State v. Faber*, 2008 MT 368, ¶¶ 28-29, 346 Mont. 449, 197 P.3d 941.

¶25 Second, Janet argues that the District Court misapprehended facts regarding James's deteriorating mental condition and susceptibility to influence. As noted above, the District Court considered evidence documenting James's cognitive state but, on the ultimate issue, found no evidence to support Janet's allegations of manipulation by Misty.

¶26 Third, Janet disputes the finding that Misty had made the relevant transfers at James's "behest." Fleming testified that the transfers made by Misty reflected the course of action James was seeking to pursue during his consultation with Fleming. This factual finding is supported by substantial evidence and is not clearly erroneous. Similarly, Janet contends that the District Court "erroneously concluded that Janet offered no proof that Misty manipulated James into opening a bank account with her." As discussed above, the

11

District Court's rejection of the allegation that Misty had manipulated her father was proper.

¶27 Finally, Janet decries as "ludicrous" the District Court's finding that Misty's actions "suggest that she was striving to meet her father's burgeoning need for care and assistance without completely stripping away his independence." As noted above, the District Court did not err in finding that the record supported the conclusion that Misty acted in accordance with her father's wishes, and that allegations to the contrary were unsupported.

¶28 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶29 Affirmed.

_____
Chief Justice

We Concur:

_____

_____

_____

_____
Justices

12